I'd like to use four minutes now, reserve a minute, and Mr. Kreisberg will speak for the Canadian applicants for intervention for five minutes. The National Meat Association is entitled to intervention under the precedence of this circuit, most recently Judge Callahan's Al-Asal decision, and that identifies the tests which have been identified previously in this circuit, and I'd like to address two of them. One is that the National Meat Association has and its members have a significant protectable interest, and the second is that that significant protectable interest is not fully represented by the government. The significant protectable interest of NMA's members is that they are buyers of cattle, and our CAF's members are sellers of cattle. So what's wrong? The government just valiantly defended your position here. Well, I'll come to that in a moment if I may, Judge Callahan, because it seems to me that, I mean, first that there has been some question whether the interest of the NMA members is contingent, that they might go out of business or something else, but in fact it's this same buyer and seller relationship, and as the government has said in its reply brief, and their language is that the gains by one part of the industry can be expected to result in corresponding losses by others. Isn't your claim the same as the energy buyers in Southern California Edison? Excuse me, Your Honor? Isn't the claim of the NMA members the same as the energy buyers in Southern California Edison? I'm not familiar with the Southern California Edison. You're not familiar with Southern California Edison versus Lynch? I'm sorry. But let me address your question, Judge Callahan, regarding why the government has not and will not represent this interest or may not represent the interest, and that is because while we agree with the government that the border should be open to both live cattle and to beef, it's the position of NMA and its members that if it is not open to live cattle, it should not be open to beef because that creates huge injury to those members here who are having to pack beef, pay higher prices for their beef, for the animals, and compete with increasing imports of boneless beef from Canada. And with the restriction on the border, the animals cost less north of the border. And because of this unfair and discriminatory competition, RCAF's members take a different position. RCAF believes that if imports of beef are safe, it's safe to import the animals, and that a U.S. packing plant with USDA inspectors ought to be able to handle those animals just as safely as a Canadian plant. In addition, RCAF members have a special sense of urgency here and a need to expedite this litigation, which goes beyond the mere tactical. This litigation has moved pretty quickly. It has moved pretty quickly. Already upon an appeal to us. And, well, and we trust that this... After the grant of a preliminary injunction in the district court, shortly after the rule was promulgated. Much quicker. Well, and we hope that it will move very quickly and that this court will vacate the preliminary injunction, Your Honor. But if it should return to the district court or in appeal proceedings, the difference in interest here is that for NMA members, a week or two of... The injunction has a cost, a benefit to RCAF members of millions of dollars a day, and it has a cost to NMA members of millions of dollars a day. And that is a very different interest. The last sentence of Judge Siebel's opinion reads, delay is prudent and largely harmless. NMA believes that that is just absolutely wrong and that that's where NMA needs to come in and protect the interest of its members, which are to reopen the border, end the discrimination, and to end the economic harm. Well, as Judge Callahan said initially, the government has very forcefully defended the regulation. They have been very forthright, but the question under the court's precedence are that intervention should be liberally granted and that it should be liberally construed here. And the question is whether the government may not represent those interests. In opening the border, our interests are simultaneous. But beyond that, they may not be. And I believe we're going to hear next from Mr. Kreisberg. Is that right? Mr. Kreisberg. Your Honor, for the record, I'm representing the Alberta Beef Producers and our co-interveners, the Canadian Cattlemen's Association. Keep your voice up. We in total represent some 90,000 cattle producers in the province of Alberta and across Canada. It's an intervention case, plain and simple. We plainly have a significant protectable interest, and the government simply may not and cannot represent those interests adequately. Let me, if I may, pick up on the adequacy of representation right away. As Your Honors know, under the Turbovich case of the Supreme Court and under the precedence of this Court, there is a very minimal showing required by a proposed intervener with respect to adequacy of representation. We simply have to raise a sufficient doubt about the possibility of inadequacy, and we simply have to show that it may be inadequate. Now, that is a hurdle low, and we easily clear it. The government ---- Yeah, but given this record and what Judge Pius said, this has moved right along. I mean, the government really is ---- I don't know what arguments you could make. The government hasn't made in your behalf. Well, Your Honor, we actually attached as supplementary excerpts of record some amicus briefs that we provided to the district court, and you can see the kinds of arguments that we made in those briefs, which were either not made or likely made only by the government. The point here is not so much finding individual little arguments, although remember the standard is that they have to be able to undoubtedly make all of our arguments, but to point out the divergence of interest. Here, with due respect, although the case has moved along, there is plenty of it yet to go. We still have a hearing on July 27, which we would very much like to participate in as a party. We have possible post-hearing submissions and possible settlement discussions, possible appeals, possible enforcements of judgment if the judgment is in our favor, all of these kinds of things we would not be able to do without being a party intervener. We can't do simply as being an amicus. The government's difficulty in representing our interests adequately is starkly clear from the juxtaposition of an NMA appeal and our appeal. Now, in the summary judgment motion filed by RCAF at the very end, they raised for the first time the issue of whether the district court should ban not only our cattle but any beef products made from our cattle from the United States as part of its permanent injunction. The injunction of beef products in addition to cattle would foreclose the entire U.S. market and therefore is a matter of supreme importance to our members. On the other hand, for the National Meat Association representing domestic packers, whether beef comes in from Canada or not is a matter of much less interest. Indeed, they probably wouldn't mind if the cattle came in but the beef didn't. So in that respect, our interests of these two interveners are quite diametrically opposed. Now, the government sits and insists it can somehow be all things to all people. It simply cannot. If it's going to represent the interest adequately of NMA, it cannot possibly represent adequately the interest of ABP and CCA. If it's going to represent our interest, it can't possibly represent the interest of NMA. It simply can't bridge that gap. In our case, we are not constituents of the U.S. Department of Agriculture. We do not, in contrast to the Arakaki case, which is cited repeatedly by our adversaries, we are not facing a situation where the government has a statutory and constitutional obligation to represent our interests. And there are no other interveners that have successfully intervened in this case that could possibly represent our interests, again, a distinction with Arakaki, where there were some other Native Hawaiian groups that had already successfully intervened. Now, we hear floodgate problems. My goodness, if you let us in, no telling who on the wings is going to try to come in. Well, the fact of the matter is there are no other active intervener motions pending in the district court or in this court other than the ones you have here today. And if this court or the district court were to find us as interveners and someone subsequently came in and sought to intervene, the court could, as was the case in Arakaki, say, well, do you have other private interveners who can represent your interests, so that it would recalibrate the issue of whether there's adequate representation to that point. Let me just briefly, if I may, if there are no questions on the permissive intervention, make just a very brief point about the significant protectable interest. If anyone has a significant protectable interest in this case, it is we. It is our cattle that's been the subject of the last one hour of oral argument and zillions of briefs and documents you've been studying. And it is our cattle that's really the target of this whole case. So we certainly have significant protectable interest. And if I have any moment left, I'll reserve it for rebuttal. Thank you, Your Honor. Okay. Thank you. Let's see. Fry. Mr. Fry, as I understand it. Yes, Mr. Fry. Thank you. I think as the questioning already from the panel indicates, USDA has certainly indicated it intends to vigorously defend this rule. The suggestion from the Canadian Cattlemen's Association that because USDA stipulated to a preliminary injunction in a previous case where RCAP caught them red-handed changing the rules without going through a rulemaking is ridiculous. And I think the facts of the briefs and the argument today demonstrate that there's no question the USDA intends to defend its rule. And that's what is at issue here, or what should be at issue, is whether the Department of Agriculture has acted consistent with its obligations to protect animal health, protect the citizens of the United States, and not whether the National Meat Association members should be able to import it. I'm kind of, I think in listening to the lawyers representing the potential interveners, they have set out where they can be at odds with each other. And I think that they probably, you could always differentiate. There are competing interests here. But do you think that the government, obviously if the government prevails, will that satisfy everything that they want? I presume so, Your Honor, because they have not challenged the rule themselves. They've suggested they have a protectable interest because they could challenge the rule, but they don't have a right to file an action for a declaratory judgment to say the rule is valid. And so they haven't challenged the rule. Some of the things that they're bringing up are really things that they wouldn't really even necessarily be able to get or might not be addressed in this lawsuit even if they were an intervener. Oh, absolutely. Absolutely. And that's obvious in the briefing, I think. You know, you're right. They do have different interests. And the American Meat Institute, which previously participated in the case, has different interests. We have a bunch of different parties that are interested, that's clear, and they don't all have the same interests. But that's precisely why we shouldn't turn this into an exaggerated interpleader action, as you described in the Al-Saw Water Corporation case, where just because different parties have different economic interests in the outcome, they ought to all be able to get in there and press their relative advantage. That's not what this case should be about, and unfortunately that's what it's largely become about. I think I would ask the Court to consider the point that we made in our brief, that a lot of these claims of irreparable harm, that the very livelihood of the Canadian cattlemen hangs in the balance, are contradicted by statements that their own officers or their own association are making to the press. They're contradicted by the fact that, according to NMA, beef from cattle that are being slaughtered in Canada, according to the NMA brief, are entering the United States at an unprecedented rate. So the Canadian cattlemen are shipping beef to the United States already under the status quo. Certainly there's big money involved, because there are millions of cows involved. But that fact alone doesn't mean that there's a crisis that is presenting these people with a life-or-death decision. If you look at what it is that they want to advocate, well, NMA wants to advocate something that has nothing to do with the Animal Health Protection Act. They want to advocate either there should be open borders and we should import cattle and beef from Canada, or there should be closed borders and we should import neither. Well, that doesn't have anything to do with whether it's risky or not to import Canadian cattle or Canadian beef. The CCA, they want to argue that their argument, again, has nothing to do with whether the United States is being subject to an acceptable risk or not. They want to defend the reputation of Canadian cattle. Well, they want more than that. They want to do more than that. They allege that their members had contracts. They had entered into contracts with shipment of cattle. Yes. In contemplation of the proposed rule. And they would like to enter. So they have an interest in trying to defend the rule to allow them to complete those contracts. That's a pretty strong protectable interest. I think if you read their assertions closely, as we suggested, those contracts apparently don't exist anymore, and what they're now talking about is that they'd like to have contracts in the future. But so would NMA like to have contracts to buy these cheap Canadian cattle, as they frankly admit. And so would a bunch of other parties who've filed amicus briefs like to have contracts to bring in cheap Canadian cattle for their feedlots or for their meat processing plants. And I submit that this is exactly that kind of slippery slope. Mr. Kreisberg says there's nobody waiting in the wings. Well, part of that is because this Court just denied yet another motion to intervene, and we'll probably have that up on appeal too. And obviously other parties have been making statements in the press that if these people's intervention is granted, then they are prepared to intervene because everybody wants to get into this case. This should not be a distraction. The United States Department of Agriculture is perfectly capable of defending, on the administrative record, its actions, and we don't need anybody else to explain those actions in order for the district court to make an appropriate decision. I want to correct something or respond to something directly. In NMA's brief, their reply brief, they said that the Animal Health Protection Act places the protection of the economic interests of the livestock and related industries given equal weight by Congress to the protection of the health and welfare of the citizens of the United States. I submit that there's no support for that statement, and it just is a clear indication of what we have here. A bunch of people whose interest has nothing to do with the Animal Health Protection Act coming in and saying, we want to get into this case because we want to make more money, we want to make more profit, and the suggestion that that's what Congress intended this statute to be used for and that it gave equal weight to their economic interests or anybody's economic interests is just ridiculous. The ---- Well, I guess they would also like to be at the table in the event there are settlement negotiations. Well, that was the first time I'd ever heard a suggestion that there would be settlement negotiations in this case, and that would be interesting given the position that the government has taken out. But if there is a settlement, there are plenty of case law in this circuit and elsewhere that they could intervene at that point to challenge the settlement. And, again, what they've shown by their briefs and by their argument here is that their interests don't really go to the core of what should be at issue in the settlement here, which is what is an acceptable level of protection for U.S. cattle and U.S. consumers, what criteria ought to be established, shouldn't we allow the Food and Drug Administration or require the Food and Drug Administration to complete the rule that it said was necessary to improve the feed ban and bring it up to the same criteria as all the other countries of the world before we let in Canadian cattle? Those are the issues that ought to be discussed in settlement negotiations and not what the effect will be on the price of meat sold on the market in Canada. So I think there's adequate opportunity for them to be heard if, in fact, settlement negotiations were to take place. We haven't talked at all about NMA's challenge to the preliminary injunction. I just want to restate our position. I think it's clear from the case law that they're not a party. They weren't bound by the injunction. And while they're adversely affected by it, so are a lot of other people, and that doesn't give everybody a chance to appear here challenging the preliminary injunction. And I think it's late, and if you don't have any other questions, I'll sit down. Thank you. There was 30 seconds left for a rebuttal. May I have 30 seconds? 30 seconds. Make it quick. I guess you couldn't get much quicker than 30 seconds. Your Honor, it's already down to 25. The Animal Health Protection Act provides for the economic protection of the livestock industry, including packers, and the livestock industry economics are at issue here. It is NMA's interest, which the government will not represent, that if the border is not be closed, not be open to fox people. If the border is closed to live animals. And so that is key. I would also, being refreshed in my memory, if I may address Judge Teshima's question. In Southern California, Edison, as in Alisal, the applicant for intervention, was a third-party creditor rather than someone sharing the same economic interest. We would urge the Court to grant the intervention. Thank you. Go ahead. Mr. Crespo. Time is running. Contracts. It is certainly correct that the contracts that we originally spoke of are no longer, because you can't expect U.S. buyers to wait month after month after month for delivery of cattle. However, that is not what this Court should be focusing on as to whether the contracts are still in existence or not. It would be truly ironic if the entry by the district court of a preliminary injunction, which extinguished our ability to fulfill those contracts, were also to extinguish our right to intervene in the case to oppose that preliminary injunction. We have demonstrated through the declarations that were in the record below that we have contractual relationships that would be able to be resumed as soon as the injunction is lifted with U.S. buyers, and that kind of contractual relationship has been found by the courts to be a protectable interest. I particularly would commend to your attention the Third Circuit's decision in the Kleisler case that we cite. There's a concurring opinion by Chief Judge Becker, which I think is extremely useful in looking at the issue of contracts both present, past, and future. But it's clear that we have contractual relationships that are hinging on the result and the outcome of this case, and that is a significant protectable interest that's been repeatedly acknowledged by the courts. Thank you. Thank you. We appreciate the arguments in this case. The matter will stand submitted, and the Court will be in adjournment until tomorrow.
judges: Tashima, Paez, Callahan